UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HAROLD D. GRIFFIN,

                                    Plaintiff,            6:09-cv-0717

            vs.

                                                         (NAM/DEP)

VILLAGE OF FRANKFORT, NEW YORK; STEVEN
CONLEY, Individually and as Chief of Police for the
Village of Frankfort; FRANK MORACCO, Individually
and as Mayor of the Village of Frankfort; RONALD
VIVACQUA, Individually and as Superintendent of
Public Works for the Village of Frankfort; and JEFFREY
VIOLA,

                                    Defendants.
_____

**APPEARANCES:**                          **OF COUNSEL:**

Office of Mark A. Wolber                   Mark A. Wolber, Esq.
239 Genesee Street
Utica, New York 13501
*Attorney for Plaintiff*

Barth, Sullivan Law Firm                   David H. Walsh, IV, Esq.
224 Harrison Street
Syracuse, New York 13202
*Attorneys for Defendants*

**Norman A. Mordue, U.S. District Judge**

### MEMORANDUM-DECISION AND ORDER

**I.    BACKGROUND**

        This case arises out of an altercation between several Village of Frankfort, New York

officials and plaintiff Harold Griffin, leading to plaintiff's arrest, prosecution, and acquittal for

Assault in the Third Degree and Resisting Arrest.  Plaintiff alleges that defendants Police Chief

Steven Conley, Mayor Frank Moracco, Superintendent of Public Works Ronald Vivacqua, and Jeffery Viola violated plaintiff's Fourth Amendment and New York state law rights when they restrained, punched, kicked, and maliciously prosecuted him on June 17, 2008, causing physical, psychological, and economic injuries. Plaintiff further alleges that the Village of Frankfort is liable because an unconstitutional policy or custom, inadequate training, and inadequate supervision caused his constitutional injuries.

Plaintiff commenced this action in New York State Supreme Court, County of Herkimer on June 1, 2009, and the defendants removed to this Court on June 23, 2009. Defendants have moved for summary judgment on the Fourth Amendment, *Monell*, and state law assault, battery, false imprisonment, and malicious prosecution clams against most of the defendants under to Federal Rule of Civil Procedure 56 and Local Rule 7.1(c), and requested that the Court decline to exercise pendant jurisdiction over the remaining state law claims against Moracco and Viola. Plaintiff responded pursuant to Local Rule 7.1(c)(3), and defendants replied.

Plaintiff commenced a second action against Conley and the Village of Frankfort in New York State Supreme Court, County of Herkimer on May 17, 2010, based on a later incident. Defendants likewise removed that action to this Court on May 27, 2010, and it remains pending at 6:10-cv-0627 (NAM/DEP).

## II.    FACTS

On June 17, 2008, plaintiff went to the village offices in Frankfort, New York, to support his wife's candidacy for trustee with a large group of friends and family. Several Frankfort officials were up for election that day, including defendant incumbent Mayor Frank Moracco, and their friends and family were present as well. Plaintiff and his group spent all afternoon milling

about the village offices, but went to the boardroom at approximately 9:00 p.m. to hear the

election results.  The village offices contain the police station, village court, and the boardroom,

all connected by a single hallway.  Many people were in the boardroom to hear the results, and

several more stood in the hallway.  After Moracco was declared the winner of the mayoral race,

he and plaintiff each exited the boardroom through separate sets of doors into the hallway.

Plaintiff then walked towards Moracco to congratulate him on his victory.

       The parties dispute the facts leading up to plaintiff's arrest.  In response to the instant

motion, plaintiff alleges that he shook Moracco's hand and said "Congratulations," but that

Moracco yanked him forward, causing him to lose balance.  Plaintiff asserts that he warned

Moracco not to pull on him again, or else the two were "going to have problems."  Plaintiff

contends that defendant Superintendent Vivacqua then grabbed plaintiff's sweater and pulled

down, restricting his movement. According to plaintiff,  Moracco and Vivacqua then began

punching and kicking him in the head and chest.  Plaintiff asserts that defendant Viola, Moracco's

son in law then jumped into the fray and began punching and kneeing him in the stomach as well.

       Plaintiff offers depositions from three witnesses who claim that they observed Moracco,

Vivacqua, and Viola punch and knee him for several minutes.  Lia Ann Grippe, a member of

plaintiff's extended family, stated that she saw Moracco "sucker punching" him while Vivacqua

held his sweatshirt, and saw Viola "tackling" and "kneeing" him.  Sharon Carlesimo, who lost the

mayoral election to Moracco that night, testified that she saw Viola knee plaintiff "a minimum of

nine times," alternating three hits at a time between his right and left leg and taking time between

bursts "to get his footing."  Carlesimo was sure Moracco and Vivacqua hit plaintiff as well, but

she could not recall "specifically" because she was focused on Viola.  Lastly, William Parry, a

friend of Carlesimo's family, testified that he saw Moracco "swinging continuously into [plaintiff's] stomach area," while Vivacqua "would pick his head up or knee his head back up when [plaintiff] was bent over." At his own deposition, plaintiff insisted that he was not punching, kicking, or "fighting anybody" while Moracco, Vivacqua, and Viola were striking him. Plaintiff alleges that he was "hunched over," covering his face and head with his arms. Grippe and Parry both testified that they saw plaintiff hunched over trying to defend himself, and they both recalled that the three men had plaintiff pinned against a wall.

Defendants contend that plaintiff was throwing punches at Moracco, and that Vivacqua and Viola rushed in to restrain him. In a sworn statement given the night of the incident, Moracco alleged that plaintiff struck him "with his fists" in his chest and head. At plaintiff's criminal trial, Viola testified that he observed plaintiff shove Moracco into a wall before swinging at him. Viola further testified that he tried to put himself between plaintiff and Moracco to break up the fight.

The parties agree defendant Chief of Police Conley entered the hallway after the altercation began. Plaintiff alleges that Grippe and Parry saw Conley move in behind plaintiff, grab him from Vivacqua, and pull his arms back and up into the air. Carlesimo testified that she saw Conley hold plaintiff in this position for "a while" as plaintiff "was continuing to be pounded against . . . [b]y the three people — the mayor, the superintendent, and the son-in-law." Grippe stated that plaintiff "had no way of reaching . . . to protect himself," and Parry recalled that "he couldn't do much" while Conley held his arms back. Parry also recalled that he tried to approach the scuffle "to grab some attention," but that Conley looked at him and stated, "Who the F are you?" Conley was not uniformed that evening, but he stated at plaintiff's criminal trial that he attempted to "subdue" plaintiff with this maneuver.

The parties agree that plaintiff bit Viola's forearm, and thereafter that Conley asked two nearby officers, Samuel Ameduri and Salvatore Capuana, for assistance. The parties also agree that plaintiff then kicked Ameduri in the groin. Defendants contend that plaintiff punched and kicked Moracco, Capuana, and Ameduri multiple times as they tried to subdue him. Plaintiff insists that he "offered no resistance to his arrest" after the kick. Although the evidence presented by both parties is inconsistent as to how long the violence continued, Conley eventually pulled plaintiff away and handed him to Ameduri and Capuana. The officers applied handcuffs and led him down the hallway to the police station.

Conley then attempted to clear the crowd that had formed in the hallway. Some witnesses recall Conley telling everybody to leave the village offices, others insist that Conley demanded that only plaintiff's wife, friends and family leave. Grippe testified at her deposition that she congregated with the rest of plaintiff's group in the parking lot discussing what they had just witnessed. Grippe recalled Conley coming out and demanding that everybody leave and threatening to arrest anybody that did not obey. Grippe stated that she asked Conley two to three times whether she could give a statement because she was five feet away from the fight in the hallway, but Conley refused each time. Plaintiff's group then moved to a nearby laundromat parking lot.

In the police station, plaintiff asserts that he sat on a bench with his hands cuffed in front of him. He states that he asked for water and for help removing his sweatshirt, but nobody obliged. Plaintiff alleges that he then pulled a cell phone from his pocket and dialed his employer, who was also a village trustee. While plaintiff was talking to his employer, he contends that Conley walked in and knocked his cell phone away, telling plaintiff that he was not

permitted to make phone calls. Plaintiff alleges that he then pulled his wife's cell phone from his pocket and attempted to redial his employer, but that Conley took that phone as well.

Plaintiff contends that Conley then brought Viola and several of Viola's family members into the police station and began insulting and arguing with plaintiff. Amidst the clamor, an officer lifted plaintiff from the bench and walked him down the hallway to the village courthouse. Plaintiff alleges that he sat in the courthouse under supervision for "hours" while Conley, Viola, and others laughed and taunted him from the hallway. Sometime around 1:00 a.m., a judge entered the courtroom, arraigned plaintiff, and released him on his own recognizance.

Grippe testified at her deposition that she went with plaintiff's wife back to the village offices to retrieve her cell phone and then returned to the laundromat parking lot where plaintiff's friends and family were still assembled. Grippe stated that she observed Moracco's group entering and exiting the village offices from the laundromat. Grippe recalled standing around discussing the altercation a while longer before leaving with plaintiff's wife. Plaintiff alleges that soon after his wife started driving, a village police officer pulled them over. Grippe testified that she heard the officer say they were being pulled over for "suspicious activity." The officer threatened to arrest them for harassment if they did not go home immediately. Plaintiff asserts that village officers pulled over plaintiff's wife and Grippe for "suspicious activity" on two more occasions that night, and that Grippe observed an officer pull over one other individual "who happened to be a friend of" plaintiff as well. According to plaintiff, the officers did not issue any traffic tickets or mention any traffic infractions during the stops.

Plaintiff was charged of three counts of Assault in the Third Degree and one count of Resisting Arrest in City Court, City of Little Falls, New York. Judge Mark R. Rose found

plaintiff not guilty of all charges on August 3, 2009.  Plaintiff thereafter filed a timely notice of

claim against the Village and initiated this action in New York State Supreme Court, Herkimer

County.  Plaintiff claims that he incurred multiple injuries during the altercation, including a

broken rib, and that he has since been unable to work because of the stress and humiliation

defendants' actions allegedly caused.

## III.    DISCUSSION

Defendants seek summary judgment on plaintiff's Fourth Amendment, false

imprisonment, and malicious prosecution claims against Conley; on plaintiff's assault and battery

claims against Conley and Viola; and on plaintiff's *Monell* claims against the Village of

Frankfort.  Defendants do not seek summary judgment on plaintiff's assault and battery claims

against defendants Moracco and Vivacqua, but do request that the Court dismiss these claims for

lack of pendant jurisdiction.

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  Substantive

law determines which facts are material; that is, which facts might affect the outcome of the suit

under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).

Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in

dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine

issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

With respect to any issue on which the moving party does not bear the burden of proof, it may

meet its burden by showing that there is an absence of evidence to support the nonmoving party's

case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(c), (e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *See Delaware & H. R. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir 1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Indeed, the nonmoving party's opposition may not rest on mere denials of the moving party's pleading, but "must set forth specific facts showing there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).

B.    Fourth Amendment and State Law False Imprisonment Against Conley

Plaintiff alleges that Conley arrested him in violation of his New York state law and Fourth Amendment rights.[1] "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . is substantially the same as a claim for false arrest under New York Law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "Under New York law, the elements of a claim for false imprisonment (or false arrest) are as follows: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Picciano v. McLoughlin*,

---

[1] Plaintiff had asserted Fourth Amendment and false imprisonment claims against officer Samuel Ameduri as well, but the parties stipulated to his removal as a defendant on October 10, 2010.

723 F. Supp. 2d 491, 500 (N.D.N.Y. 2010).  The parties do not dispute that Conley confined

plaintiff when he grabbed him from behind, that plaintiff was conscious of the confinement, and

that plaintiff did not consent to the confinement.

Under federal and New York law, "probable cause serves as a complete defense to the

charges of false arrest." *See Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985).

"Probable cause arises when the police reasonably believe that 'an offense has been or is being

committed.' " *U.S. v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (quoting *U.S. v. Cruz*, 834 F.2d 47,

50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1077 (1988)).  In evaluating probable cause, courts

consider the facts available to the officer at the time of the arrest.  *Martinez v. Simonetti*, 202 F.3d

625, 634 (2d Cir. 2000); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996); *see

also Broughton v. New York*, 37 N.Y.2d 451, 458 (1975).  "The fact that charges against an

arrestee are eventually dropped, or that he is acquitted after trial, 'has no bearing on the

determination of whether probable cause existed to arrest him.' " *Rinaldi v. City of New York*, 756

F. Supp. 111, 115 (S.D.N.Y. 1990) (quoting *Krause v. Bennett*, 887 F.2d 362, 370 (2d Cir. 1989)).

There is no question that Conley began arresting plaintiff when he attempted to "subdue"

him.  Defendants argue that Conley had probable cause to arrest plaintiff for assault in the third

degree once he observed plaintiff bite Viola, *see In re Yolanda B.*, 724 N.Y.S.2d 451, 452–53

(N.Y. App. Div. 2d Dep't 2001), and after the bite for kicking Ameduri in the groin and resisting

an authorized arrest.  "A person is guilty of assault in the third degree when . . . [w]ith intent to

cause physical injury to another person, he causes such injury to such person or to a third person."

N.Y. Penal Law § 120.00 (McKinney 2011).  Furthermore, "[a] person is guilty of resisting arrest

when he intentionally prevents or attempts to prevent a police officer or peace officer from

effecting an authorized arrest of himself or another person." *Id.* § 205.30.  Lastly, defendants state

correctly that Conley need not have had probable cause for each offense charged; Conley need

only have had probable cause for some criminal act to justify arresting plaintiff.

Plaintiff, however, offers evidence showing that Conley began arresting plaintiff *before* he

had a reason to believe that plaintiff had committed or was committing a criminal act.  *See*

*Mazyck v. Johnson*, 08-cv-548 (CPS)(SMG), 2009 WL 2707360 at *4–5 (E.D.N.Y. Aug. 25,

2009).  Parry testified at deposition that he saw plaintiff "pinned against the wall" attempting to

block punches and knees from Moracco, Vivacqua and Viola at the time Conley jumped in.

Grippe also testified at deposition that did not see plaintiff strike anybody before Conley

restrained him, and stated that he was being punched and kicked at the time Conley entered the

hallway.  Plaintiff asserts that he did not hit anybody, but was instead defending his face with his

arms until Conley lifted them up and behind his back.  The *uncontroverted* criminal act

defendants rely on — that plaintiff bit Viola — happened *after* Conley began the arrest.  Conley

himself recalled the following at plaintiff's criminal trial:

| | |
|---|---|
| Q. | Okay.  Do you — do you recall, or, did you see Defendant [Harold Griffin] when he bit? Did you see the Defendant bite Mr. Viola? |
| [Conley:] | Yes, I did. |
| Q. | Where were you when that — when you saw that? |
| A. | Standing right behind him. |
| Q. | Okay.  Right behind? |
| A. | Harold [Griffin]. |
| Q. | Harold? Okay.  And at that time you were already engaged in trying to remove him? |
| A. | Yes, I was. |

A reasonable jury could find that when Conley first observed the altercation, he had no reason to

believe plaintiff had committed or was committing a crime because plaintiff was guarding his

face with his arms while three other men were punching and kicking his head, chest, and stomach.

10

Plaintiff's evidence raises a question of material fact as to whether Conley had probable cause to conduct the arrest based on the facts available to him at the time of the arrest.[2]

Plaintiff also asserts that he bit Viola in self-defense.  An officer's awareness of facts at the time of the arrest supporting an exculpatory defense can negate probable cause.  *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003).  Although an arresting officer "is not required to explore and eliminate every theoretically plausible [exculpatory justification] before making an arrest" supported by probable cause, *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 128 (2d Cir. 1997), an officer is not permitted "to deliberately disregard facts known to him which establish justification." *Jocks*, 316 F.3d at 136.  Self-defense is an exculpatory justification for committing crimes against the body, N.Y. Penal Law § 35.15, and so an officer who observes "plainly exculpable" defensive acts does not have probable cause to conduct an arrest for those acts.  *See Deolatch v. Kelsey*, 3:09-cv-1871 (MRK), 2010 WL 1981564 at *7 (D. Conn. May 18, 2010).

As above, a reasonable jury could conclude that Parry and Grippe's personal observations support a finding that Conley saw plaintiff acting in self-defense when he was pinned up against the wall, covering his face with his arms, and not throwing any punches or kicks of his own. Plaintiff's own assertions — that he was attempting to block his face with his arms, and that once Conley removed his arms his only defense was to bite — could further support a finding that

---

[2] The parties do not address whether Conley had probable cause to arrest plaintiff for disorderly conduct as soon as he observed the plaintiff engaged with Moracco, Vivacqua and Viola. *See* N.Y. Penal Law § 240.20 ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 1. [h]e engages in fighting or in violent tumultuous or threatening behavior; or . . . 3. [i]n a public place, he uses abusive or obscene language . . . .").  Nevertheless, plaintiff asserts that he was not threatening or fighting at all at the time Conley entered the hallway, and as such, there is still an issue of material fact as to whether Conley had probable cause to arrest plaintiff when he did.

plaintiff's acts subsequent to the arrest were plainly in self-defense.  Therefore, plaintiff also raises an issue of material fact as to whether any probable cause that may have existed after the arrest was negated by the "plainly exculpable" nature of his acts.

Because plaintiff has raised an issue of material fact regarding the existence of probable cause when Conley made the arrest and regarding the exculpatory nature of plaintiff's actions during the arrest, defendants' motion for summary judgment dismissing plaintiff's Fourth Amendment and state law false imprisonment claims against Conley must be denied.[3]

C.    State Law Malicious Prosecution Against Conley

To prevail on a § 1983 claim against a state actor for malicious prosecution, "the plaintiff must show a violation of his rights under the Fourth Amendment," *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997), and meet the elements for malicious prosecution under New York law. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).  "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy*, 118 F.3d at 947) (internal quotation marks omitted).  The parties do not dispute

---

[3] Defendants do not seek dismissal of plaintiff's Fourth Amendment claim against Conley based on qualified immunity.  Qualified immunity rests on (1) "whether the facts, viewed most favorable to the plaintiff establish a constitutional violation" and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68–69 (2d Cir. 2004).  Because issues of fact remain as to whether there was a constitutional violation and whether it would have been clear to a reasonable officer in Conley's position that it would have been unlawful to arrest plaintiff, dismissal of plaintiff's Fourth Amendment claim on qualified immunity grounds is premature at this juncture.

that Conley initiated or assisted in initiating a criminal proceeding against plaintiff for assault in the third degree and resisting arrest, and that plaintiff was acquitted on all charges.  As above, plaintiff has presented an issue of material fact as to whether Conley had probable cause to conduct the arrest.  Therefore, defendants' motion rests on whether plaintiff has presented evidence sufficient to show that Conley pursued criminal charges against plaintiff out of actual malice.

"The element of malice implicates an evil or unlawful purpose," such as "the pursuit of the lawful end by the intentionally unlawful means."  *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1999) (internal quotation marks and citations omitted).  So too, "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Ramseur*, 865 F.2d at 465 (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984); *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)) (internal quotation marks omitted).  Given that malice implicates an individual's intent and state of mind, when there is "an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).

Since plaintiff has raised an issue of material fact as to probable cause, he has also raised an issue of material fact as to his malicious prosecution claim.  *Mazyck*, 2009 WL 2707360 at *4–5.  Further supporting this conclusion are the multiple submissions plaintiff offers in response to the instant motion indicating that Conley was acting with malice.  Plaintiff offers deposition testimony from Grippe, Carlesimo, Parry, and himself indicating that Conley held his arms up so that he was defenseless to other defendants' punching and kicking for several minutes before completing the arrest.  Plaintiff offers testimony from Viola given on cross examination at his

criminal trial that indicated he did not see plaintiff kick Vivacqua in the groin, even though he said so the night of the fight in a sworn statement used to support plaintiff's criminal charges. Plaintiff alleges that Conley was rude and aggressive towards him after the arrest. Plaintiff asserts that Conley prevented Parry from intervening on plaintiff's behalf during the arrest. Lastly, plaintiff alleges that Conley threaten to arrest Grippe after the incident and that village officers pulled over witnesses in plaintiff's group without justification. Therefore, defendants' motion for summary judgment on plaintiff's malicious prosecution claim against Conley must be denied.

D.    <u>Assault and Battery Against Conley</u>

Defendants assert that plaintiff's assault and battery claims against Conley should be dismissed because plaintiff has offered no evidence to support a finding that Conley committed an offensive touching. Defendants further assert that Conley interacted with plaintiff during the course of an arrest, meaning that plaintiff's claims should be analyzed under the Fourth Amendment. However, "[c]ontact during an *unlawful arrest* may give rise to claims for assault and battery." *Banushi v. City of New York*, 8-cv-2937 (KAM)(JO), 2010 WL 4065414 at *6 (E.D.N.Y. Oct. 15, 2010) (citing *Wyllie v. Dist. Att'y of Cnty. of Kings*, 2 A.D.3d 714, 718 (N.Y. App. Div. 2d Dep't 2003) (emphasis added). Because there is an issue of material fact as to whether Conley conducted a lawful arrest in the first place, to survive summary judgment plaintiff need only raise an issue of material fact as to assault and battery.

To recover for battery under New York law, "[a] plaintiff . . . must prove that there was bodily contact, that the contact was offensive . . . and that the defendant intended to make the contact without the plaintiff's consent." *Goff v. Clarke*, 302 A.D.2d 725, 726 (N.Y. App. Div. 3d

14

Dep't 2003) (citing *Messina v. Matarasso*, 284 A.D.2d 32, 35 (N.Y. App. Div. 1st Dep't 2001); *Zgraggen v. Wilsey*, 200 A.D.2d 818 (N.Y. App. Div. 3d Dep't 1994)).  To recover for assault under New York law, "there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact."  *Cotter v. Summit Sec. Servs., Inc.*, 14 A.D.3d 475, 476 (N.Y. App. Div. 2d Dep't 2005) (quoting *Bastein v. Sotto*, 299 A.D.2d 432, 433 (N.Y. App. Div. 2d Dep't 2002)).

Plaintiff asserts that Conley lifted up his arms from behind, exposing him to punching and kicking from other defendants.  Deposition testimony from Grippe, Carlesimo, and Parry all verify his account.  This directly controverts defendants' assertion that there was no offensive contact.  *See Guntlow v. Barbera*, 76 A.D.3d 760, 766 (N.Y. App. Div. 3d Dep't 2010) (application of shackle to conduct unauthorized arrest was offensive).  Indeed, a reasonable jury could conclude that he was acting in concert with other defendants in causing injury to the plaintiff through physical contact.  Therefore, defendants' motion for summary judgment must be denied as to plaintiff's state law claims for assault and battery against defendant Conley.  *See Banushi*, 2010 WL 4065414 at *6; *Locke v. N. Gateway Rest., Inc.*, 233 A.D.2d 578, 579 (N.Y. App. Div. 3d Dep't 1996) ("It is well settled that 'once intentional offensive conduct has been established, the aggressor is liable for assault . . . .' " (quoting *Sanchez v. Wallkill Cent. Sch. Dist.*, 221 A.D.2d 857, 857 (N.Y. App. Div. 3d Dep't 1995))).

E.     <u>Assault and Battery Against Viola</u>

Defendants assert that plaintiff failed to raise a triable issue of fact as to whether Viola assaulted and battered him because there is no evidence indicating that Viola intended to touch the plaintiff.  To the contrary, plaintiff offers deposition testimony from Carlesimo and Grippe

indicating that they observed Viola kneeing and punching plaintiff in the stomach.  Therefore, because plaintiff has raised an issue of material fact as to whether Viola assaulted and battered the plaintiff, defendants' motion for summary judgment must be denied on these claims as well.

F.     _Monell_ Claims Against the Village of Frankfort

Plaintiff asserts that the Village of Frankfort is liable for the violation of his constitutional rights through the actions of its employees pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978)*,* under three theories: (1) the exercise of an unconstitutional official policy or custom, (2) the failure to train, and (3) the failure to supervise.  Defendants contend that the Village is not liable under any of these theories because there was no unconstitutional policy or custom and because the alleged inadequacies did not cause plaintiff's constitutional injuries.  For the reasons outlined below, defendants' motion for summary judgment dismissing all of plaintiff's *Monell* claims must be granted, and the Village of Frankfort must be dismissed as a defendant in this action.[4]

1.     Official Policy or Custom

Under *Monell*, "[l]ocal governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  A municipality may not be held liable for the acts of its employees based on *respondeat superior*; liability can only be found

---

[4] "Likewise, with regard to the individual defendants, to the extent" the complaint can be construed as asserting claims against them "in their official capacities, the claims against them are duplicative of the *Monell* claim" against the Village.  *Vassallo v. Lando*, 591 F. Supp. 2d 172, 202 n.54 (E.D.N.Y. 2008).  Therefore, any purported claims against Conley, Moracco, or Vivacqua in their official capacities must be dismissed as well.

where the execution of the municipality's policies deprives an individual of his or her constitutional rights. *See id.* at 690–92. Indeed, to establish municipal liability, the *policy* must cause the constitutional violation. *See Monell*, 436 U.S. at 692. Defendants argue correctly that plaintiff does not offer evidence of any policy or custom that has caused injury similar to plaintiff's in the past.

"[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances" and that "the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. Cincinnatti*, 475 U.S. 469, 481 (1986). Municipal liability for a single policy decision from a policy maker "attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). Further, a municipality is not vicariously liable for the tortious acts of a final policy maker; it may only be held liable under this theory for *establishing or implementing unlawful policies*. *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986).

Plaintiff does not assert that any actual policy or custom existed in or flowed from Conley's, Moracco's and Vivacqua's actions. Plaintiff does not assert that Conley, Moracco, or Vivacqua declared "among various alternatives" that arrests are to be conducted without probable cause and with excessive force, *see id.* at 481–84, nor does he offer evidence that the Village continued arresting citizens pursuant to that policy after his arrest. Plaintiff makes the conclusory assertion that because Conley, Moracco, and Vivacqua could be considered final policymakers, their actions constituted Village policy. That they were policymakers acting under color of state

17

law who may have committed torts or constitutional violations establishes nothing more than a
*respondeat superior* connection between their actions and the Village of Frankfort. *Accord
Monell*, 436 U.S. at 691–92; *Weber*, 804 F.2d at 802–03. Therefore, defendants' motion for
summary judgment on this aspect of plaintiff's *Monell* claim must be granted.

2.     Failure to Train

        "Where a city's official policy is constitutional, but the city causes its employees to apply
it unconstitutionally, such that the unconstitutional application might itself be considered
municipal policy, the city may be held liable for its employee's unconstitutional acts." *Amnesty
Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Consequently, a municipality can
be found liable "where [it] is aware that its policy may be unconstitutionally applied by
inadequately trained employees but the city consciously chooses not to train them." *Id.* Liability
attaches when "the constitutional wrong has been caused by that failure to train." *City of Canton
v. Harris*, 489 U.S. 378, 387 (1989). "There are limited circumstances in which an allegation of
'failure to train' can be the basis for liability under § 1983." *City of Canton*, 489 U.S. at 387.
Specifically, failure to train "requires that plaintiffs establish not only that the officials' purported
failure to train" was a result of "deliberate indifference, but also that plaintiffs identify a specific
deficiency in the [municipality's] training program." *Amnesty Am.*, 361 F.3d at 129 (quoting *City
of Canton*, 489 U.S. at 391).

        Plaintiff offers no evidence of specific training programs regarding Mayor Moracco or
Superintendent Vivacqua, let alone how such training programs were deficient. Defendants'
motion for summary judgment on any claim of liability against the Village based on the failure to
train Moracco and Vivacqua must therefore be granted. *See id.*

Plaintiff insists that the Village gave little or no training to its subordinate officers.  In deposition testimony, Conley could not recall whether he furnished procedures or training material to officers while he was Chief of Police.  He admitted that he did not keep records of which officers had gone through what training, and he did not have officers tested to determine what they already knew.  Lastly, Conley conceded that did not keep track of supervisors who were supposed to interact with officers about the department's rules and regulations.  Contrary to plaintiff's argument, however, these alleged deficiencies do support his failure to train claim. Plaintiff's constitutional claims are that he was arrested without probable cause and his arrest was conducted with excessive force.  Because Conley was the individual who started the arrest, it is the training that Conley received that is actually at issue.

At deposition conducted in relation to plaintiff's other lawsuit, Conley admitted that did not receive training from the outgoing Chief of Police when he was elevated to Acting Chief in 2006.  Conley further admitted that he was elevated due to retirement of the former Chief of Police, and that he initially failed the civil service test that was required for him to become Chief.[5] Nevertheless plaintiff has not raised an issue of material fact as to whether this alleged failure to train *caused* plaintiff's constitutional injuries.  At the same deposition, Conley testified that he took numerous training courses as a police officer, and that he underwent supervisory training at Onondaga County for 40 hours a week, every week for several months.  Conley also stated that he passed the civil service exam he failed previously and became chief in 2008.  Conley asserted that

---

[5] Defendants argue that this Court should ignore Conley's deposition because it was taken during the course of discovery related to another action in this Court.  There is no such restriction on the source of a deposition for purposes of deciding a motion for summary judgment.  *See* Fed. R. Civ. P. 56; L.R. 7.1(a)(3).

he inherited the department's entire institutional knowledge when he was appointed chief, including all its rules, regulations, policies, and procedures.  Importantly, plaintiff does not identify a deficiency in the content of the training courses or the material Conley received.

If Conley did commit a constitutional wrong, it cannot have been caused by the willful failure of the Village to train him.  *See Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 393–96 (S.D.N.Y. 2009).  Therefore, because plaintiff has raised no triable issue of fact as to whether inadequate training caused the constitutional violations he allegedly suffered, defendants' motion for summary judgment on this aspect of plaintiff's *Monell* claim must be granted.

3.    Failure to Supervise

To establish municipal liability for Fourth Amendment violations based on the failure to supervise, "the city's policymakers [must have been] 'knowingly and deliberately indifferent to the possibility that its police officers were wont' to violate the constitutional rights of arrestees." *Amnesty Am.*, 361 F.3d at 127 (quoting *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986).  "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).  Obvious need for better supervision is apparent, for example, when little or no remedial effort followed multiple complaints of constitutional violations, when the violative practice was unusual as compared to most police departments, or when the practice "presented an unusually high risk that constitutional rights would be violated." *Id.* at 1049–50.

Plaintiff asserts that Conley did not supervise officers on the scene of the arrest.  Plaintiff also appears to claim that Conley did not supervise Moracco and Vivacqua because he did not

stop them from assaulting and battering him.  Nevertheless, plaintiff's only alleged constitutional injury focuses on the *arrest*, and the individual responsible for conducting the arrest was Conley. As such, the crux of plaintiff's failure to supervise claim is whether or not Conley *himself* was supervised as Chief of Police.

Plaintiff offers no evidence that the Village Board or Mayor Moracco knew and ignored some probability that Conley was wont to violate the constitutional rights of arrestees at the time plaintiff's arrest occurred.  Plaintiff offers no evidence that Conley had violated rights of arrestees in the past and that Moracco or the Board failed to do anything about it.  To the contrary, plaintiff provides evidence showing that after Conley failed his first civil service exam, the Board considered removing him as Acting Chief until he passed.  Plaintiff's evidence also shows that the Board was active in hiring and firing Village police officers.  Far from indifference, plaintiff shows that the Board was involved in police department affairs, and that it paid attention to Conley's performance.  These uncontroverted facts indicate that the Village did not disregard any risk Conley might violate arrestees' constitutional rights, and that therefore, defendants' motion on this aspect of plaintiff's *Monell* claim must be granted.  *See Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985) ("Mere negligence in permitting the continued employment of personnel . . . does not rise to the level of 'action pursuant to official municipal policy of some nature [which] caused a constitutional tort.' " (quoting *Monell*, 436 U.S. at 691)); *Yang Feng Zhao*, 656 F. Supp. 2d at 396–99 (municipal defendant not indifferent even though it undertook "modest" efforts to investigate and discipline misconduct).

F.    Pendant Jurisdiction

Defendants removed this action from New York State Supreme Court, and now seek

dismissal of plaintiff's remaining state law claims for want of jurisdiction.  Plaintiff has raised an issue of material fact as to his federal Fourth Amendment claims, and plaintiff would ordinarily be expected to try them all in one judicial proceeding.  Therefore, this Court declines defendants' invitation to remand plaintiff's remaining state law claims to the New York State Supreme Court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

**IV.    CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the motion (Dkt. No. 26) by defendants for summary judgment dismissing the complaint is GRANTED as to all claims against the Village of Frankfort, New York, and

ORDERED that the motion (Dkt. No. 26) by defendants for summary judgment dismissing the complaint is otherwise DENIED.

IT IS SO ORDERED.

Date:   January 24, 2012

Honorable Norman A. Mordue
U.S. District Judge